IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:11cr004-WKW |
| | ) | |
| QUINCY B. JONES | ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant's motion to suppress (Doc. #121) and the government's response (Doc. # 127). The court heard evidence on the motion on June 2, 2011. For the reasons set out below, the motion is due to be denied.

### Facts

On November 16, 2010, F.B.I. special agent Donald Vanhoose received a call from a confidential informant ("the CI") who said that he had just seen the defendant, Quincy Jones, with Terrance Bivins at Bivens' residence at 905 Blackshear Street. The CI reported that Jones and Bivins were counting out an estimated $10,000 in cash retrieved from a hole in a sofa, and that Jones was about to leave to buy cocaine from his cousin, who was known as "Big Ced" (Cedric). The CI told Vanhoose that Jones would be driving a blue Toyota Camry with missing hubcaps and a sticker with the number 24 – a number that related to tire size – on the back window.

Vanhoose knew Terrance Bivins from controlled purchases of crack cocaine made previously by the same CI. Specifically, on July 29, 2010, the CI ordered crack cocaine from Joseph Richardson, which was delivered to him at a local barbershop by Terrance Bivins and

another individual. In addition, on October 16, 2010, the CI again ordered crack cocaine from Joseph Richardson, which was delivered to him by Richardson and Bivins at the residence at 905 Blackshear Street.

Vanhoose was also familiar with defendant Jones. On August 10, 2010, the CI had ordered crack cocaine from Richardson, which was delivered to him at the same barbershop by Jones. In addition, according to the CI, Jones had been present at 905 Blackshear Street on October 16, 2010, when the CI purchased crack from Richardson and Bivins.

Because of the success of these controlled buys – and of two additional controlled purchases by the CI of crack cocaine from Joseph Richardson that did not involve either Bivins or Jones – Vanhoose considered the CI to be reliable. Further, according to Vanhoose, the CI had given law enforcement additional reliable information concerning where specific individuals lived, who was involved with narcotics trafficking, who was running the barbershop, and the location of gambling houses and the activity occurring outside them.

After the CI made contact with Vanhoose on November 16, 2010, Vanhoose called his partner, Dothan Police Department Investigator Jeremy Kendrick, and reported the information concerning Quincy Jones to him. The information was also given to Investigator Small with the Houston County Sheriff's Department, who relayed it to Deputy Mike Stacey. Stacey was told that Quincy Jones was driving a blue Toyota Camry in the area of Blackshear Street that was missing hubcaps and had a sticker somewhere on the side or rear indicating tire size. Small also told Stacey that Jones was en route to buy narcotics and that there should be a large sum of money in the vehicle.

Stacey drove to the area immediately and located a Camry that appeared to match the description given by the CI. Stacey testified that, as he followed the Camry, he saw the vehicle "roll through" a stop sign (that is, fail to come to a complete stop at the stop line) at Houston Street and North Oats/Montgomery Highway. Stacey activated his blue lights and pulled over the Camry. The traffic stop was recorded on videotape.

Stacey patted down the driver of the Camry, whom he identified as Quincy Jones, for officer safety. He testified that he could feel from the outside that there was a large bulge in Jones' back left pocket, and could also see from the top of the pocket what appeared to be the end of a large amount of money. Stacey asked Jones, with reference to his pocket, "you don't mind me going in it?" and Jones said, "Aright."[1] Investigator Small, who had also arrived at the scene, asked if he could search the vehicle, and Jones gave consent.[2]

Stacey called in Jones' driver's license information to dispatch so the information could be verified. He also called in the car tag. While he waited for a response and wrote out a warning for the traffic violation, and later on while the search was proceeding, Stacey and other officers asked Jones questions concerning, *inter alia*, where he lived and worked, who owned the car, his criminal history, and where he got the money. Jones made several statements indicating that the money came from a cashier's check that his sister had sent him. The stop lasted approximately 32 minutes, including the search of the vehicle.

Officers seized $4,455.00 in U.S. currency from defendants' pocket. No evidence was

---

[1] The exchange concerning consent to search the pocket was rapid, and Jones' "aright" (all right) is only faintly audible on the videotape. Jones maintains that he did not consent to the search.

[2] Defendant does not dispute that he consented to the search of the vehicle.

recovered from the vehicle.

## Discussion

Defendant contends that Stacey did not have reasonable suspicion to stop his vehicle, and that he had no authority to search defendant's pocket and to seize the money. Defendant also argues that the stop was pretextual, and that it was unnecessarily prolonged. He maintains further that his statements concerning the money are due to be suppressed. These arguments are without merit.

Traffic Stop

The legality of the traffic stop in this case is analyzed under Terry v. Ohio, 392 U.S. 1 (1968). Pursuant to Terry, "[l]aw enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity." United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citing Terry v. Ohio, 392 U.S. 1 (1968)). "The Terry rationale allows police to stop a moving car based on a reasonable suspicion that its occupants are violating the law." Diaz-Lizaraza, 981 F.2d at 1220.

"'Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop.'" United States v. Davis, 175 Fed.Appx. 286, 287 (11 Cir. 2006) (citations omitted); see also Illinois v. Andreas, 463 U.S. 765, 772 n. 5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, ...the knowledge of one is presumed shared by all."); United States v. Olmedo, 552 F. Supp.2d 1347, 1356 (S. D. Fla. 2008) ("[W]ith regard to an investigatory stop, there

is no requirement that police who have reasonable suspicion sufficient to justify a stop communicate the basis of that reasonable suspicion to police who have been instructed to effectuate the stop.").

In the instant case, the court concludes that Stacey had reasonable suspicion to stop the Camry on two grounds. First, as the videotape demonstrates, defendant failed to come to a complete stop at the stop line. Alabama law provides that "[e]xcept when directed to proceed by a police officer every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line ... ." Ala.Code 1975 § 32-5A-112(b).[3] It is true that, in making the traffic stop, Stacey also desired to halt the car in the hope of finding evidence of planned criminal activity – that is, the purchase of narcotics. However, the Supreme Court and the Eleventh Circuit have determined that "ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred." Draper v. Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004); see also Whren v. United States, 517 U.S. 806, 812-13(1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir.1997). As the Eleventh Circuit has explained, "under Whren, the constitutional reasonableness of a traffic stop must be determined irrespective of intent, whether of the particular officer involved or of the theoretical reasonable officer." Id. (internal quotation marks and citation omitted). Thus, so long as Stacey possessed probable cause to believe that defendant committed a traffic violation, the stop complied with the Fourth Amendment regardless of his desire to

---

[3] Deputy Stacey also "rolled through" a stop sign. However, "[t]he driver of an authorized emergency vehicle may ... [p]roceed past a red or stop signal or stop sign ... after slowing down as may be necessary for safe operation... ." Ala. Code 1975 § 32-5A-7(b)(2).

intercept money intended to purchase drugs. Id.

Second, officers had a reasonable, articulable suspicion based on objective facts that Jones was about to engage in criminal activity. Their collective knowledge included the fact that Jones had previously delivered crack cocaine to a confidential informant on August 10, 2010, and had been present at 905 Blackshear Street on October 16, 2010, when the CI had purchased crack from Richardson and Bivins. In addition, the CI had just come from the Blackshear Street residence where he observed Jones and Bivins counting out a large sum of cash retrieved from a hole in a sofa, and he reported that Jones was about to leave to buy cocaine from his cousin. Further, the car pulled over by Stacey reasonably matched the description provided to him. While the information from the CI was incorrect as to one of the digits – the sticker had the number 20 rather than 24 on it – the court cannot conclude that this relatively minor discrepancy has constitutional significance, in light of the accuracy of the remaining description and the past reliability of the informant.[4]

These specific and articulable facts, which were part of the collective knowledge of the law enforcement officials involved with the investigation, taken together with rational inferences from those facts, as well as the officers' experience and training, reasonably

---

[4] The CI also erred as to the amount of currency that defendant would have in his possession, although he was correct that it was a large amount. The CI estimated $10,000.00, but $4,455.00 was in fact recovered from defendant's pocket.  However, the amount of cash was not used by Stacey to identify the Camry as the vehicle described by the CI.  The same is true for the mistaken reference to the Camry as a Nissan in Narrative #2 of the offense report (Defendant's Exhibit 2). This report, prepared by Investigator Kendrick on November 18, 2010, two days after the incident, reflects an error by Kendrick as to the make of the vehicle. However, as the report itself notes, Stacey, not Kendrick, was the officer who pulled over the Camry. The report also correctly reflects in Narrative #1, dated on the day of the incident (November 16, 2010), that the vehicle involved was a Toyota Camry.

warranted the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009).

Weapons Patdown

Once Stacey stopped the Camry, he was entitled to frisk the driver if he had a reasonable suspicion that Jones was armed and dangerous. Arizona v. Johnson, __ U.S. __, 129 S. Ct. 781, 784 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop ... the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" M.D. ex rel. Daniels v. Smith, 504 F. Supp.2d 1238, 1243 (M.D. Ala. 2007)(citation omitted).

Here, when Stacey conducted the patdown, he believed that the driver of the vehicle was en route to purchase narcotics with a large quantity of cash. He also believed that Jones had taken an extended time to stop his vehicle and that he appeared to be nervous. Prior cases have recognized that "'investigative detentions involving suspects in vehicles are especially fraught with danger to police officers,'" noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile." Michigan v. Long, 463 U.S. 1032, 1047-1048 (1983)(citation omitted). In addition, individuals involved in narcotics trafficking are often armed. United States v. Cruz, 909 F.2d 422, 424 (11 Cir. 1989); see also United States v. Martin, 794 F.2d 1531, 1533 (11 th Cir. 1986) ("[W]eapons in effect are 'tools of the trade' in drug trafficking."). Accordingly, under the totality of the circumstances, a

reasonably prudent man in Stacey's circumstances would be warranted in the belief that his safety or that of others was in danger, and therefore a weapons patdown was justified.

Consent to Search/"Plain Sight" and "Plain Touch" Exception

Defendant maintains that he did not consent to Stacey's search of his pocket. "'In considering whether a consent to search was voluntary, [the courts] examine the totality of the circumstances.'" United States v. Payne, 2008 WL 4671778, 4 (M.D. Ala. 2008) (citation omitted). "'A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'"" Id. (citation omitted). "'In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.'" Id. (citation omitted).

The exchange concerning consent to search Jones' pocket is brief. As noted above, Jones' one word assent – "aright" – is barely audible on the videotape. However, this brief consent does appear on the recording and, in addition, Deputy Stacey testified that this was Jones' response. Although Jones now disputes that he consented to a search of his pockets, the court finds the officer's testimony credible.

As to voluntariness, Stacey had not at the time of the consent engaged in any coercive police procedures, and there is no evidence that Jones lacked intelligence or education. Although Stacey did not inform Jones of his right to refuse consent, neither did Stacey tell

Jones he must consent, and knowledge of the right to refuse consent is only one factor to be considered. Id. Jones was not restrained or under arrest at the time of the consent, and Stacey had not brandished a weapon or otherwise coerced Jones' acquiescence. Thus, under the totality of the circumstances, the court finds that Jones' consent was the product of an essentially free and unconstrained choice.

Moreover, the so-called "plain view" and "plain touch" exceptions would render the search lawful even if defendant did not consent. "'The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). Further, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context. Minnesota v. Dickerson, 508 U.S. 366, 375-376 (1993). "Regardless of whether the officer detects the contraband by sight or by touch ... the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." Id. at 376. To give rise to probable cause, the incriminating character of the object must be immediately identifiable. Id.

When Stacey patted down the defendant for weapons, he could feel from the outside

that there was a large bulge in Jones' back left pocket. In addition, he clearly observed a portion of the cash protruding from Jones' pocket. Thus, the incriminating nature of the cash was immediately apparent, as Stacey had been advised that investigators believed that Jones was en route to buy narcotics with a large sum of money in the vehicle. The cash had not been put away in a wallet, but was still folded in defendant's pocket. Stacey stopped defendant shortly after he left the residence for the alleged purpose of buying drugs with the money from the sofa, without any delay that would have permitted defendant to dispose of that cash or acquire another sum of cash for other purposes. In addition, "[c]ourts have readily acknowledged that large sums of cash are indicative of the drug trade[.]" United States v. Brooks, 594 F.3d 488, 495 (6th Cir.2010); see also United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir.1992) ("The courts generally view items such as firearms, large quantities of cash, and uncharged quantities of drugs as 'tools of the trade' for distributing illegal drugs."); United States v. Cole, 2010 WL 3211027, 17 (N.D. Ga. 2010).

Under these circumstances, Stacey's retrieval and seizure of the cash from defendant's pocket during the Terry stop satisfied the "plain view" and "plain touch" exceptions to the warrant requirement.

Duration of the Stop

The next question before the court is whether the traffic stop exceeded its bounds and became an unreasonable seizure under the Fourth Amendment, so that the officers' questions should be deemed impermissible and defendant's statements excluded. An officer's actions

during a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place," United States v. Purcell, 236 F.3d. 1274, 1277 (11th Cir. 2001), and the duration of the stop must be limited to the time necessary to effectuate the purpose of the stop. Id.

> However, once effectuating a legal stop, an officer has "the duty to investigate suspicious circumstances that then [come] to his attention." *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir.1991) (citation omitted). The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not "prolong[ ] beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Furthermore, an officer can lengthen the detention if he has reasonable suspicion of illegal activity other than the traffic violation, or if the detention has become a consensual encounter. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir.1999).

United States v. Cantu, 227 Fed.Appx. 783, 785, 2007 WL 986913, 2 (11th Cir. 2007).

In this case, the court cannot conclude that the duration of the traffic stop was unreasonable. Stacey used a reasonable amount of time to check Jones' identification, car tag, and registration, and to issue a warning. "[P]olice officers conducting a traffic stop may 'prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003). "Similarly, out of interest for the officer's safety, we have found that officers may permissibly prolong a detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." Id.

Thereafter, both Jones and Stacey waited while other officers carried out the consent search of the vehicle and inventoried the money seized. Although Stacey and other officers

asked questions during the stop that were not directly related to the traffic violation, only "unrelated questions which unreasonably prolong the detention are unlawful; detention, not questioning, is the evil at which Terry's prohibition is aimed. Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional traffic stop." United States. v. Francis, 140 Fed.Appx. 184, 186 (11th Cir. 2005).

In addition, the law is clear that "[t]he traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." Id. at 1278 (citation omitted)(emphasis added); see also United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004); Boyce, 351 F.3d at 1106. Here, Stacey had articulable suspicion of other illegal activity, as noted above. Further, once Jones consented to the search, the encounter became consensual. United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) ("[F]urther questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.").

Statements

Defendant argues that his statements concerning the cash are due to be suppressed. Again, this argument is without merit.

> Under Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of is rights and knowingly waived those rights." United States v. Parr, 716 F.2d 796, 817 (11th Cir.1983)."The requirement that an individual receive Miranda warnings before answering questions applies only when the individual is in custody." United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir.1989). In determining whether an individual is in custody, the test is whether a reasonable person "would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest." Id. (quotation marks omitted).

United States v. Crawford, 294 Fed.Appx. 466, 473, 2008 WL 4291326, 6 (11th Cir. 2008). It is well-settled law that "[g]enerally, a person temporarily detained pursuant to an ordinary traffic stop is not 'in custody' for the purposes of Miranda." Id. (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)); see also United States v. Ubaldo-Viezca, 398 Fed.Appx. 573, 579, 2010 WL 3895710, 6 (11th Cir. 2010) ("Ordinary traffic stops do not involve custody for purposes of Miranda, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest. ... In determining whether a defendant's freedom was curtailed 'to a degree associated with formal arrest,' we consider the totality of the circumstances, including whether the officers brandished weapons or touched the defendant, whether the officers used a language or tone indicating that compliance with their orders could be compelled, and the location and length of the detention.") (citations omitted).

In this case, the defendant was detained in broad daylight in an area open to public view. The tone of the officers' questions was informal and cordial. Jones was not tricked into speaking. Neither Stacey nor the other officers drew their guns, raised their voices, or ordered defendant into a position commonly associated with a formal arrest. No physical force was used against the defendant, he was not touched except during the patdown. He was not restrained by handcuffs. The length of the detention was not inordinate, given the necessity for officers to conclude the consensual search of the vehicle and the inventory of the currency seized.

Thus, under the totality of the circumstances, the court concludes that defendant was

not subjected to a restriction of his freedom to a degree associated with a formal arrest and, therefore, defendant's statements are not due to be suppressed.

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. #121) be DENIED. It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **July 12, 2011**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable. Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. Nettles v. Wainwright, 677 F.2d 404 (5 Cir. th 1982). See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982). See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 29th day of June, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE